## PEOPLE v. MAGGIO.

(Supreme Court, Appellate Division, Second Department. June 19, 1902.)

ASSAULT—EVIDENCE—SUFFICIENCY.

     Complainant, while driving, met defendant, an Italian, and a boy of Italian descent. An altercation resulted, but the teams finally passed. The Italians continued calling complainant vile names, and when the teams were some 60 feet apart complainant got out and threw a stick of wood at them. Defendant then got out of the other wagon, and, as complainant was getting in, he was shot through the arm. The pistol was found on defendant the next day, he claiming that when he got back into the wagon he took it from the boy. In answer to the direct question which one shot him, complainant stated he did not know, but testified that the one that did it "stepped back and fired." The boy had remained in the wagon. *Held* to sustain defendant's conviction.

     Goodrich, P. J., and Woodward, J., dissenting.

Appeal from trial term, Nassau county.

Vinantonio Maggio was convicted of assault in the second degree, and appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Mitchell May, for appellant.
James P. Niemann, Dist. Atty., for the People.

HIRSCHBERG, J. The defendant has been convicted in the county court of Nassau county of the crime of assault in the second degree. On appeal he alleges no error except that the verdict is against the weight of evidence. The assault consisted in the discharge of a pistol, which took effect in the left arm of the complainant, a German farmer named Louis Miller, the ball entering, according to the evidence of the physician, the posterior of the arm about six inches from the shoulder and emerging about two inches from the curvature of the elbow. The general tendency of the shot was therefore downward along the arm, indicating, of course, if the arm was hanging limp by the complainant's body, that the shot came from above, or, if the shot came on a level from behind, that the complainant's arm at the time was

raised so as to be horizontal. The shooting took place at quarter past 5 in the afternoon of January 24, 1901. The sun set on that day at 8 minutes past 5, so that it must have been still quite light. The complainant was driving a team with a load of wood on an old country road near Hicksville, in Nassau county, when he met the defendant, an Italian, riding with a boy 16 years old, of Italian descent, named Legrego, who was driving a single horse, and an altercation ensued as to the division of the road for the purpose of passing. The Italians called the complainant vile names. He said: "Both hollered. Both hollered, and I hollered, too." He also testified, "Both stopped, and they hollered at me, and called me a son of a bitch." The wagons finally passed, and the boy had driven about 60 feet beyond the complainant on the road, when, the hollering continuing, the latter got down from his load of wood, and, breaking off a small twig, threw it in the direction of the defendant and his companion. It is undisputed that it hit neither of them, and it would be unreasonable to assume that it alarmed either of them. The complainant, immediately after throwing the stick, attempted to climb back upon his load of wood, and it was while he was so engaged that he was shot. He testified that he had raised his right arm to grasp the reins when the shot was fired. He does not say in what position his left arm then was, but it would certainly be difficult for him to climb upon the load of wood with his left arm hanging by his side. It is quite likely that his left arm was raised upon the load in order to aid him in mounting; but, whether it was or not, it is absolutely certain that it was in such a position that a shot fired either by Legrego or the defendant would inflict the wound which was in fact inflicted. This results from the fact that Legrego has testified that the shot was fired by the defendant, standing upon the ground by the side of his wagon, or while jumping out of his wagon, while the defendant has testified that the shot was fired by Legrego sitting in the wagon. It is therefore conceded that one or the other of them fired the shot, and there is nothing in the nature of the wound in itself to incriminate the one rather than the other. In neither case would the shot be fired from an elevation. It is agreed that the defendant was either jumping out of or stood by Legrego's wagon when the shot was fired. He admits that he was then standing on the road. The distance was about 60 feet. The complainant says Legrego's wagon had passed him about 50 steps when the shot was fired; that they were about four or five lengths of his wagon away, and that his wagon was about 12 feet long. At a distance of 60 feet on the highway there would be no appreciable difference in the nature or course of a wound in the arm, whether the pistol was in the hand of a man standing on the road or in the hand of a boy seated in an ordinary road wagon. If there was any difference in elevation it would be a matter of a few inches, and the difference of even 1 foot in elevation in a 60-foot shot would be so minimized by the distance as to be practically incalculable. There are a number of circumstances, however, which plainly point to the guilt of the defendant. He was the one who was so far exercised by the controversy as to jump out of the wagon. The boy kept his seat, attending to his horse; and, while he may have been the louder in discharging epithets, it is

not always the one who does the shouting that does the shooting. When they were arrested the next day, the pistol was found on the defendant. He says that immediately after the shooting, and while he was jumping back upon the wagon, he took the pistol from the boy. But it was found with a fresh cartridge in place of the one which had been discharged, and, if the defendant took the pistol from the boy in order to prevent the latter from continuing to shoot, there was no reason why he should have allowed the boy to reload the weapon, and certainly no reason why he, if innocent, should have kept on his person, until arrested, the incriminating evidence. The boy in the wagon would naturally have his back to the complainant, and would be in an unfavorable position to shoot. Moreover, the complainant, who was obviously impartial, and who had no other apparent motive than the punishment of the guilty one, testified substantially that the defendant did the shooting. He stated that it was the defendant who jumped out of the wagon while the boy kept his seat (which circumstance both the defendant and the boy corroborate), and in describing the occurrence said "he stepped back from my wagon and fired." This significant statement he made in English, before an interpreter was sworn. He added: "I was going to catch my line, and wanted to step on my wagon. Then I received the shot in the left arm. The shot came from behind, and came out in front of the arm. Q. And came out in front; is that right? A. Yes, sir. The man then went on his wagon." It therefore clearly appears that while, in answer to the direct question as to which one shot him, he answered that he did not know, he yet plainly described the shooting by saying that the man who did it stepped back and fired, and then got upon the wagon, which could apply, of course, to no one but the one who had alighted and was upon the ground at the time. The shot was a cowardly one, delivered without the stress of apprehension or fear, from the rear, and after the altercation, such as it was, had wholly subsided, and chance only prevented it from culminating in murder. No good reason appears why an appellate court should reverse the finding of an intelligent jury under the circumstances, and especially does no good reason appear why this unfortunate result should be accomplished in the sacred name of justice.

Judgment of conviction affirmed. All concur, except GOODRICH, P. J., and WOODWARD, J., who dissent.